Good morning, Your Honors. May it please the Court, my name is Janie Thompson. I'm a UCLA law student serving as pro bono counsel on behalf of Petitioner Isabel Marques. I'm joined today by Christopher Craig from O'Melveny Myers, and we'll be splitting our oral argument time. I'd like to begin by addressing Ms. Marques' asylum claim. The record before us compels a finding that Ms. Marques Counsel, forgive me, but if you could speak a little more slowly, the acoustics are hard for me in here. Of course. The record before us compels a finding that Ms. Marques be granted asylum because of her reasonable fear of future persecution on account of her religion. This Court in Zhang v. Ashcroft determined that if a petitioner cannot practice their religion in their native country, that it rises to the level of religious persecution. In subsequent cases, that case actually was for the higher burden of withholding of removal, and in subsequent cases, the Court applied the same analysis to asylum. Did she suffer religious persecution when she was in her home country? Before her departure? This ban on the Manor Church, which is a minority Christian faith in Angola I asked you a question. Oh. It calls for a yes or no answer. You can explain after you give me a yes or no answer, but it will help me understand your answer if you tell me, was she subject to persecution before she left? No, Your Honor. Okay. So, and I will let you explain, but you understand that if you suffered persecution before, then you have a presumption of future persecution. You don't get the benefit of that presumption. You agree with that? Yes, Your Honor. Okay. So these are developments that happened after she left. Yes, Your Honor. Go ahead. In December 2007, which was after the petitioner left Angola, that was when the Angolan government revoked registration for the Manor Church, and when Angola has a provision requiring that religious groups have registration in order to have legal status and in order to have the ability to congregate and spread their beliefs. This happened, as I said, in December 2007, so it happened after Ms. Marquez left, but it prevents her from returning and being able to practice her religion. What evidence is there that others who are members of the church have been persecuted? Ms. Marquez credibly testified that several members of the church have been imprisoned and others have been threatened with imprisonment for spreading their beliefs, and at least one church member was poisoned. This evidence was corroborated by Ms. Rita Raimondo, who She wasn't there, right? I mean, this all happened after she left. So unless she's telepathic or Correct, Your Honor. I mean, you know, how does she know? The Manor Church has a very tightly knit group of they have churches in several nations and they remain connected through the internet, radio, television. They also have weekly meetings of church elders, of which Ms. Marquez and Ms. Raimondo are both church elders, and this is how they stay in contact and find out what's going on. Why isn't this the kind of evidence that a reasonable trial of fact could simply reject? Say, look, she wasn't there, she didn't see it, she didn't talk to any of the people. This is basically a rumor, hearsay, probably multiple-level hearsay, and we just don't credit it. Why can't a trial of fact reasonably fail to credit such evidence? Your Honor, in this case, Ms. Marquez has a great fear of contacting local and Golan authorities and staying in contact with people. And because of that, it's been difficult to get evidence that is more specific. We do, however, have evidence from But she has a burden, right? She has a burden of proof, and the fact that she finds it difficult to meet the burden doesn't relieve her of the burden, right? Correct. That's the law. Correct, Your Honor. She was found credible, so her testimony is to be taken as true. And in addition, she provided other documents from MANA adherents who wrote a letter to the Angolan government protesting the ban, saying that it violated their right to religious freedom that is, in theory, provided under the Angolan Constitution, but is, in fact, not upheld because of this restriction on minority faiths. Was she a member of the church before she left? She has been a member of the church since 1989, I believe. But she wasn't an elder? She's received additional training since she left. She took three courses to become a church elder and gain more authority in the church. So the answer to the question is she was not an elder before she left? Based on the record, I don't believe so. This has been a more recent development. This has happened. She's gained more authority in the church as she's continued her time there and was asked to come to the United States to start home groups here of the MANA church. Counsel, what, in your view, is the significance of Exhibit 9, the International Religious Freedom Report, which seems to suggest that things were not so problematic for religious minorities? Your Honor, the Religious Freedom Report says that Angola generally respects religious freedom, but this does not cite to cases when Angola may not respect religious freedom. Also, this report predates when the MANA church was banned, and we don't have updated record evidence. Moreover, as both of these cases are related to religious freedom, there is record evidence that they were invited to re-register. However, there is no evidence that they have, in fact, been granted registration or that they would be. Isn't it the invitation that matters if the question is what's the government's attitude? Well, the fact that they were invited to re-register is more a broad grant. There are several minority faiths that have not been granted registration and still have pending applications. Moreover, one of the requirements is that a religious group have more than 100,000 adherents, and based on the record, the MANA church only has 25,000, which suggests that they would not be granted registration even if they applied. I would like to cede the rest of my time to my co-counsel. Very well. Thank you. Thank you. Thank you, Your Honors. I'm Christopher Craig, also pro bono counsel with Elmenia Myers. I can address any Convention Against Torture issues that the panel would like to address, although I am also happy to continue talking about asylum. As Ms. Thompson explained, we think that the religious claims here alone justify asylum for Ms. Marquez. Even though she herself did not witness what happened in Angola, she adequately corroborated that, both the testimony of Ms. Ramundo and also with some of the reports that are in the record itself. There's a letter from the bishops of the church saying that it's been banned, and there's other record evidence that shows that the MANA church has, in fact, been banned. Counsel, I found the briefing a little bit confusing on the point you just made where you said the record regarding religious persecution alone, you think, warrants asylum. Are you making other claims for asylum? The other claim we're making for asylum is to say that the religion claim, although we think that alone it justifies asylum, that the religion claim should be analyzed under the one central reason standard. So it's not that we're arguing specifically that there are other claims. We would concede that her journalism claim and her claim about the bank loan, on their own, would not merit asylum. So it's still about the religion claim for us. It's just that the religion, we think, under the one central reason standard, does not need to be evaluated in isolation. It can be evaluated under the totality of the circumstances test. Well, that's exactly the problem that I'm having. Because it sounds to me that maybe I am understanding your briefing correctly and you're wanting to sweep in what I call the 1996 journalism incident, if I've got the year right, and also the claim regarding the debt that your client owes to someone who I think is a member of the police force there. And you want us to consider that as part of the single claim for asylum, which is based on religious persecution.  Yes, Your Honor. That's correct. All right. The reason why we think those both inform is because under the one central reason standard, her fear of returning to the country, even though we think her fear is based on religious persecution, are enough. Because of what's going on with the man of church, because she cannot practice her religion openly, because of the Falun Gong line of cases that say that being unable to practice your religion openly is enough to merit asylum. The burden on us is not even that high under the totality of circumstances and one central reason standard. Because she also faces an individualized risk of persecution if she goes back, specifically from Silva and Corenta, because of the bank loan that she owes them and because of her past history as an opposition journalist. We think that all these fears that she has combined contribute to her reasonable fear of future persecution. The only threats I saw in the record, and I want to make sure that you correct me if I'm wrong, but the only threats I saw pertaining directed to your client relate to the journalism claim and the other claim, the debt claim, not religious persecution. Is that right? That's correct, Your Honor. Although we think the reason that we can't really speculate entirely as to what would happen as to her religion. However, she didn't have the opportunity to face specific threats because of religion, because the religion was banned after she fled the country. Is the argument that even if any of these fears are not individual enough, that you can aggregate them, that in the aggregate they provide a sufficient fear? Yes. I don't think I've seen a case like that. I thought you either have a fear of this or you have a fear of that. But if you have three different areas where you're afraid, but neither of them is quite enough, I don't see how you can aggregate them. Well, the Parisimova case that articulates the one central reason standard is a little different because it was one incident that the petitioner in that case had suffered. She had been attacked in, I believe, Kazakhstan because of that. Whereas here, they are totally disparate. The debt claim has nothing to do with her religious claim at all. It just happens to be one wholly unrelated cause, right? Isn't that pretty clear that that is just a private dispute between her and individuals who happen, some of whom happen to be policemen? I think the link, Your Honor, is that because there is ample record evidence that members of the Monte faith have been arrested in Angola, and because she faces that risk, even though she faces that risk because of her religion and Corentin Silver are not particularly interested in her religion, I think the fact that she could be arrested because of her membership in the Monte faith could put her and put the country on, you know, could put the police in Angola on alert that she's there. Corentin Silver could not find her. What does that have to do with the debt claim? It would allow the member of the police and secret police that are after her because of this debt to find her. If she was in prison because of her membership in the Monte faith, if she is indeed persecuted for that, then I think we can say that there is at least a 10 percent chance of her future persecution because of her religion. Once she is found by the police... But the trial fact found otherwise. What do you do with that? Sorry, Your Honor. Trial fact, the IJA and the BIA found otherwise. What do you do with that? I think we can say on this record that their finding is erroneous. And I actually, the facts that, whether or not the facts below constitute whether or not the facts of the persecution is reviewed de novo, whether or not they are sufficient for asylum is reviewed de novo. And I think under the facts of this record, we can say that the IJA and the BIA found erroneously. I think they overly relied on the country report, which happened before the man of church was even banned. I think they ignored the letter from the bishop. I think they ignored Ms. Raimundo's testimony. I think they concentrated on the fact that Ms. Marquez herself... When you say ignored, do you mean they weren't persuaded by it? They ignored it. It's sort of like they don't refer to it. They ignored it. It's like they didn't know it was there. They simply didn't find it persuasive, right? I think in the case of the country report, we can say that they ignored the fact that the country report predated the man of church being banned. I think they did. In their reliance on the country report, they ignored the circumstances of the country report. The country report is really something of a red herring. And they essentially below said, this country report says that freedom of religion is essentially open, even though that predated the man of church ban. And then they just went on from there and said, okay, this is, reasonably speaking, a religiously free country. I would agree that they didn't find Ms. Raimundo's testimony persuasive and they didn't find Ms. Marquez's testimony persuasive. But I think that also, we can say, is clearly erroneous. I think... You have two minutes left. Do you want to say something? Thank you, Your Honor. I wasn't checking the clock. We'll hear from the government. May it please the Court. Matthew George for the Attorney General. It seems Petitioner has now changed her argument to saying that the agency abused its discretion in weighing the evidence. However, the standard of review here is substantial evidence.  I don't know. I don't know. We have found certain evidence, such as the testimony of Petitioner versus the country reports in the record, more persuasive than something entirely within the agency's discretion. Substantial evidence supports the Board's finding that the country reports showed that Angola respects religious freedom and that Petitioner's testimony was not persuasive and was not corroborated, despite two opportunities provided by the immigration judge to corroborate that testimony. She's now also conceded that her journalism and debt asylum claims do not merit asylum on their own. Therefore, despite the fact that she's failed to exhaust them by raising them to the Board, she's now conceded that they do not merit asylum on their own merit. What is your response to this, the argument that the fears can be aggregated so that a person who has a small amount of concern about religious persecution but a huge amount of concern about something that isn't a protected ground, a dispute with a neighbor, a debt collection, whatever it may be, how should we respond to that argument? Well, I think that's the one central language. That's the language the Court addressed in Parisimova. I can't pronounce that case. The one central reason language means it must be an important reason or not necessarily a primary reason, but I don't know, significant. I mean, there's some language in there that addresses exactly what the weighing sort of of that concern must be. So if it just so happens, oh, she's got this other unrelated religious dispute, whereas we've got Quarantine Silva harming her on account of this private debt, she would have to show that the religion was sort of the main motivation or a protected ground was the main motivation of the harm she's going to suffer and not that it's just sort of in there somewhere or in the aggregate. She's a member of these different groups or these religions or whatever protected ground she may be a part of. It has to play a primary role. I think it's almost a but-for cause is what the Court said in Parisimova. And so there's no real aggregation of, hey, by the way, I'm a man of religion adherence, but they're really after me because of this debt, but because I had this other status, that I can sort of bootstrap myself into a protected ground or asylum under the statute. The asylum, on account of a protected ground, has to be the motivating factor for that harm. And she hasn't shown that the two creditors here would be motivated by any protected ground. In fact, she said, first, it no longer merits asylum on its own, and she's failed to exhaust any well-founded fear on that basis. Again, looking at the corroboration issue, the immigration judge here was very specific on exactly what corroboration he wanted. He cited the very vague and undetailed testimony of both Petitioner and Ms. Raimondo as exactly what he wanted objective corroboration of and gave Petitioner two opportunities to provide that corroboration. She failed to provide it and also failed to provide an explanation. And under this Court's decision in Wren, the immigration judge didn't need to go behind that decision and ask for an explanation. Now, in her board brief, she did attempt to provide explanations, but she did not provide the evidence at that time. She didn't ask to remand the case and present the evidence that she should have presented and say, hey, board, here's what my counsel failed to provide. Here it is now. Please send it back to the immigration judge and let him evaluate it now that we've got this evidence. And she didn't, still in her brief today, say, here's all this great evidence that my counsel should have provided. In addition, she never made any allegations that her counsel was ineffective for not providing that information. And so, therefore, the agency's corroboration findings on their own are substantial evidence that Petitioner has failed to meet her burden of showing a well-founded fear. The country reports in the record overwhelmingly say that Angola respects religious freedom. Okay. Thank you. You've got a couple of minutes left for rebuttal. Thank you, Your Honor. I would like to just say that one thing I think we need to distinguish is past versus future persecution. And even though Paris-Samoa deals with past persecution, what we're looking at here is really the situation going forward. And what this Court, I think, needs to do is look at the one central reason. But you do understand that the finding of past persecution is quite important in that it then raises a presumption of future persecution. You can go forward, a Petitioner can carry his burden with proving nothing further except past persecution, right? Yes, Your Honor. That's true. So that's a pretty significant difference. Yes, Your Honor. And we cannot argue past persecution on the basis of religion because that religion was only banned after she left. I think we can say that there is past persecution in the form of Sylvan Carenta's threats to her, although that is not on a protected ground. And so the one central reason standard here comes in, I think this Court needs to weigh going forward, what is her reasonable fear of future persecution? And I don't think we're trying to bootstrap the fact that she has this fear of Sylvan Carenta onto a weak religion claim. Bootstrap has sort of a pejorative cast to it. So I know you don't want to use that. But the fact is you are trying to tie the two together. They don't work otherwise, right? She has been threatened on account of religion because she wasn't there when it was banned. She was, I mean, she was found credible that she had this dispute with powerful members of the police, I mean, the secret police and police, about money. And so what you're trying to do is tie them together. I mean, whether you call it bootstrapping or not is a way to cast it, right? But you are trying to tie them together. I don't think we need to tie them together. Again, we think her religion is enough. And I think the court below, the BIA and the IJ, did indeed ignore some corroborating evidence like the letters from the church in 311 to 313. There's also ample evidence on the Internet that her counsel below unfortunately did not cite. But I do think we gain even more from the benefit of the fact that she has also faced these threats. I'm sorry. Are you referring to evidence not on the record that's on the Internet? Is that what you're saying? Yes. So slipping in there? Yes, Your Honor. But I think it just goes, it's not publicized. You think it's appropriate to do that? I mean, if you want us to take judicial notice or something, you can, you know how to do that, right? There are rules about it. You file notice. You give opposing counsel an opportunity to object, give us a chance to actually look at the evidence and consider whether or not it's subject to judicial notice. But you can't just slip it in there at argument. That's not really appropriate conduct. Is it, counsel? Your Honor, we did cite the Internet evidence in our opening brief. So I think Respondent is on notice of that evidence. Did you seek judicial notice of it? We did not go through the formal process. Sorry, Your Honor. So how can we consider it? How can we consider it? How can we consider something? I mean, you know, who knows how something gets on the Internet? I mean, stuff gets on the Internet that's happily false, right? There's tons of stuff like that. So the fact that you say it's on the Internet is actually probably proof of its falsehood more than it's true, right? So, no, this is a serious question. How can you say, oh, it's in the Internet? I mean, you can have particular Internet websites that might have credibility or, but then again, it's, this is not a forum to splash those things out. It's not the kind of thing that's evidence that you have to present to a trial fact. It's a fair point, Your Honor. And that was the job of your client's lawyer in the administrative agency, and the lawyer didn't present it, and then there's no claim of ineffective assistance of counsel. So it doesn't really come in here, does it? Fair point, Your Honor. I don't think we need the Internet point, and I withdraw it. I think that there is, however, ample evidence that the Monarch Church has been banned. But there's an important point here. You're dealing also with counsel who's a student. I think it's important to set the proper example. It is not proper for you to cite materials that are not in the record. It's not proper to sort of cite them at oral argument or raise them before the court when you know perfectly well that these are things that we may not consider. And that's not part of professional behavior. You do understand that, right? Yes, Your Honor. I apologize. And so putting it in the brief, which presumably you did read before you filed with this Court, and then raising it at argument is something that you should not have done. Fair point, Your Honor. I apologize. Indeed. Do you have anything further? Just to reiterate that I think this record still amply shows that there has been persecution of the man of faith, and that Ms. Marquez has every reason to fear that going forward. In addition to the fears that she has of Sylvan Correnta torturing her for her bank loan. Thank you. Thank you. The case is argued.
judges: Kozinski, Graber, Christen